Tracy **THORNE**, Plaintiff,

v.

**UNITED STATES DEPARTMENT OF DEFENSE, et. al., Defendants.**

**Civil Action No. 95–369–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 20, 1996.

Mark A. Behrens, Crowell and Moring, Washington, DC, for Plaintiff.

Sylvia T. Kaser, Department of Justice, Civil Branch, Washington, DC, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff in this action attacks the Department of Defense's ("DoD") controversial "Don't Ask, Don't Tell" Plan (the "Plan") as violative of the First Amendment. It is not the "Don't Ask" but the "Don't Tell" portion of the Plan that is the target of plaintiff's constitutional challenge. In brief, plaintiff contends that the Plan, on its face and as applied, punishes speech as opposed to conduct.

In a Memorandum Opinion dated March 4, 1996, the Court focused on plaintiff's facial challenge and followed an analytical path that, distilled to its essence, may be summarized as follows:

(i) The heart of the Plan is the premise that a service member's declaration of homosexuality gives rise to a presumption that the person engages in or will engage in prohibited homosexual conduct;

(ii) The presumption purports to be rebuttable, but plaintiff contends that it is, in fact, irrebuttable and that, as a consequence, a declaration of homosexuality invariably results in dismissal from the service;

(iii) Whether the Plan's presumption is rebuttable is of constitutional significance. If the presumption is irrebuttable, then the Plan is a speech restriction subject to heightened scrutiny under the First Amendment. On the other hand, if the presumption is rebuttable short of recantation, then the Plan's focus is conduct not speech and the First Amendment is not implicated here;

(iv) But because the record then before the Court precluded a confident conclusion concerning the presumption's rebuttability, the parties were directed to supplement the record. *Thorne v. United States Department of Defense*, 916 F.Supp. 1358, 1367 (E.D.Va.1996) ("*Thorne I*").

Four weeks after the issuance of *Thorne I*, the Fourth Circuit, sitting *en banc*, decided another case involving a First Amendment challenge to the Plan. *Thomasson v. Perry*, 80 F.3d 915 (4th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 358, 136 L.Ed.2d 250 (1996). There, the majority held that the presumption in the Plan was rebuttable and that, as a consequence, it targeted conduct, not speech. Although *Thorne I* antedated *Thomasson*, the Fourth Circuit did not cite or refer to *Thorne I* in its decision. Accordingly, the task at hand is twofold: (1) to determine whether *Thomasson* is dispositive of this case; and (2) to consider whether the enhanced factual record supports plaintiff's contention about the presumption's irrebuttability in practice. Put another way, this Court must determine whether the Fourth Circuit's decision supersedes *Thorne I* and whether the supplemental information forecloses plaintiff's constitutional claims.

### I

The facts of this case, already set out in *Thorne I*, are essentially undisputed. *Thorne*, 916 F.Supp. at 1361–62. Plaintiff, Tracy Thorne, served more than six years as a commissioned officer in the United States Navy. Thorne's military career began in 1988 when he entered Aviation Officers Candidate School. He ultimately earned the designation of Naval Flight Officer. On May 19, 1992, he publicly disclosed his homosexuality during an appearance on the ABC News program "Nightline." Soon thereafter, the Navy initiated proceedings to separate Thorne from the service. Following nu-

merous procedural twists and turns,[1] the Secretary of the Navy accepted a Board of Inquiry's recommendation and honorably discharged Thorne in March 1995. Thorne then filed this action challenging the Plan.

This action came before the Court on the parties' cross-motions for summary judgment. In its March 4 opinion, as modified by an Order dated March 12, 1996, *Thorne v. United States Department of Defense*, C.A. No. 95–369–A (March 12, 1996),[2] the Court directed the parties to submit supplemental memoranda focusing on whether the presumption embodied in the Plan is actually rebuttable short of a service member's recanting the statement declaring his or her homosexuality. The parties complied, submitting additional facts about the DoD's implementation of the Plan. In particular, plaintiff submitted the administrative records of eight "Don't Ask, Don't Tell" cases where service members avoided involuntary separation from the military.

## II

The threshold question is whether, as the government argues, *Thomasson* requires dis-

missal of this case, thus, making a review of the supplemented record neither necessary nor appropriate. Thorne disagrees, arguing that *Thomasson*, read closely, leaves unresolved whether the Plan's presumption is rebuttable short of recantation and that, as a consequence, the enhanced factual record merits evaluation.

In *Thomasson*, the majority concluded at the outset that the presumption was, indeed, rebuttable. In reaching this conclusion, the *Thomasson* majority relied on its understanding that "other [service] members subject to discharge under the statements provision have successfully demonstrated that they lack a propensity or intent to engage in homosexual acts." *Thomasson*, 80 F.3d at 932 (citing *Richenberg v. Perry*, 909 F.Supp. 1303 (D.Neb.1995); *Able v. United States*, 880 F.Supp. 968 (E.D.N.Y.1995)).[3] Of course, from this followed, ineluctably, the conclusion that the Plan merely used speech as evidence of prohibited conduct and did not punish speech directly. Hence, the Plan targeted conduct and was content-neutral.[4] *Id.* at 933.

1. The policy in effect at the time of Thorne's televised disclosure discharged service members, and denied enlistment to civilians, solely on the basis of homosexual orientation. DoD Directive 1332.14, Enlisted Administrative Separations, encl. 8 (1981); DoD Directive 1333.30, Separation of Regular Commissioned Officers for Cause, encl. 2 (1981), reprinted in 32 C.F.R. pt. 41, app. A ¶(h) (1994). Under that policy, a Board of Inquiry unanimously recommended that Thorne be discharged on the basis of his status. The Board then submitted the proceedings and its recommendation to the DoD for final review. Prior to issuing a decision in the matter, the DoD suspended all pending discharge proceedings pursuant to an executive order issued directing the Secretary of Defense to review the policy. The Plan emerged from that review and supplanted the policy. Unlike its predecessor policy, the Plan, at least in theory, focuses on conduct, not status. In light of this change, the Navy reinstated Thorne, but reconvened discharge proceedings against him pursuant to the Plan. This case challenges only the Plan, not the former homosexual exclusion policy.

2. This Order clarified *Thorne I* and the accompanying March 4, 1996 Order as follows:

   Because the Court considered Thorne's facial challenge to the "Don't Ask Don't Tell" plan in addition to his as-applied challenge, the Court invited the parties to submit further evidence

relating to how the plan is actually implemented. Such evidence may be relevant to the construction of the plan and hence to a determination of whether the plan amounts to a speech restriction on its face.

   \*  \*  \*  \*  \*  \*

   In addition, the parties are invited to submit any additional evidence they wish relating to the application of the plan to Lt. Thorne in particular, which would be relevant to his as-applied challenge. Any such additional evidence is to be submitted pursuant to the schedule set forth in the March 4 Order.

3. Subsequent to *Thomasson*, the Eighth Circuit affirmed *Richenberg* and the Second Circuit vacated and remanded *Able*. *See Richenberg v. Perry*, 97 F.3d 256 (8th Cir.1996); *Able v. United States*, 88 F.3d 1280 (2d Cir.1996).

4. The Fourth Circuit then contemplated the level of judicial scrutiny that should be accorded to content-neutral military regulations of speech. *Id.* at 933–34. The majority adopted the deferential standard of review from *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) and *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). And it found that standard easily satisfied. *Id.* at 933–34.

   Next, the majority rejected Thomasson's as-applied challenge on the ground that he had

On its face, *Thomasson* is dispositive here for it seems to resolve. the centrally important question of the presumption's rebuttability. Yet, a plausible, if not ultimately persuasive, argument can be made that *Thomasson* is not dispositive on the rebuttability of the presumption because the two cases on which it relies in finding the presumption rebuttable arguably do not support this point. Neither case directly addresses whether anything short of recantation can serve to rebut the presumption. Although the district court in *Richenberg v. Perry,* 909 F.Supp. 1303 (D.Neb.1995), noted that "seven service members thus far have successfully rebutted the presumption," *id.* at 1313, it did not reveal how this was accomplished. It might conceivably have been by recantation, which, of course, does not 'rebut the presumption but instead denies or retracts the factual basis for the presumption. And in *Able,* the district court rejected the government's proffered examples of service members who had escaped discharge as mere "aberrations," holding that the presumption was, in fact, irrebuttable in prac-

tice. Thorne argues, not unreasonably, that *Richenberg* and *Able* are unpersuasive evidence of the presumption's rebuttability and that *Thomasson* is, to this extent, not dispositive.

Ultimately, it is unnecessary to decide whether *Thomasson* is dispositive on the essentially factual issue of the presumption's rebuttability [5] because even assuming the factual record at bar is more complete than the *Thomasson* record, this record, too, supports the conclusion that the presumption is rebuttable.

### III

■ The supplemented record in this case consists of the records of eight separation proceedings under the Plan.[6] In all eight, the Board of Inquiry or Board of Review assigned to each proceeding found the presumption rebutted.[7] In four of the eight, the service member's promise to remain celibate was accepted as an effective and sufficient rebuttal of the presumption.[8] In another

---

freely chosen not to come forward with any evidence to rebut the presumption. *Id.* at 932.

5. Of course, it is also possible that the DoD's interpretation and implementation of the Plan may change over time and hence that the rebuttability of the presumption may likewise change from rebuttable to irrebuttable. Thus, the presumption's rebuttability is essentially a factual issue that may deserve reexamination later if there is evidence of change in the DoD's interpretation and implementation of the Plan.

6. For purposes of this Memorandum Opinion, the eight cases are numbered 1 through 8 in roughly chronological order of the dispositions by Boards of Inquiry or Review. The first case, Case No. 1 was apparently disposed of on June 22, 1994 and the last, Case No. 8 was apparently disposed of on December 19, 1995. Cases Nos. 2 through 7 bear dates of disposition between these two dates.

7. The government did not produce a transcript of the administrative proceeding for Case No. 7. Although the service member rebutted the presumption, it is impossible to determine how this was accomplished. Accordingly, Case No. 7 is of little value here.

8. In Cases Nos. 1, 4, 6, and 8, the targeted service members rebutted the presumption, in part, by promising to refrain from all homosexual activity. Case No. 1 involved a female sailor who admitted her homosexuality because of her

concern about status-based discrimination. As her rebuttal, the service member declared that she "fully under[stood] and intend[ed] to follow the rules and regulations prohibiting homosexual conduct." Case No. 4 involved a Navy Lieutenant who declared that she was a lesbian, but claimed that she had intended her statement to convey only a message about her sexual orientation: "when I made that statement that I am a lesbian, that statement was to indicate my sexual orientation. It, in no way, was meant to imply any propensity or intent or desire to engage in prohibited conduct." Case No. 6 involved an airman who acknowledged his homosexuality on two occasions and who possessed a picture of himself kissing another man. In response to the inquiry whether he could eschew committing any homosexual acts, the service member responded that "[t]o the best of my ability, I believe that fully, especially with God in my life, I believe that fully." And Case No. 8 involved an eighteen-year veteran of the Navy who confessed his homosexuality to his Commanding Officer while requesting leave to care for his dying male partner. The Board of Review reversed the Board of Inquiry's unanimous recommendation to separate the service member, finding that he only sought to convey the dire importance of his request and that his promise to abide by all military regulations was credible. For further discussion of this case, see *infra* pp. 928–929. In these four cases, the service members' promises to remain celibate were decisive to their effective rebuttals.

case, the service member rebutted the presumption by showing that the statement had been uttered in confidence during a counseling session.[9] Finally, two service members rebutted the presumption by expressing their sexual confusion and by disavowing their prior statements of homosexuality.[10] Taken together, the records of these eight proceedings point persuasively, if not decisively, to the conclusion that the Plan's presumption, as applied by the DoD, can be rebutted short of recantation.

Seeking to avoid this conclusion, Thorne points out that seven of the eight cases do not deserve any weight in determining whether the presumption is rebuttable because they predate a DoD memorandum, issued by the DoD's General Counsel Judith A. Miller, essentially directing Boards of Inquiry to reject any distinction between status and conduct [11] and to separate service members solely on the basis of their declarations of homosexuality. *Memorandum for the Military Departments. Subject: Policy on Homosexual Conduct in the Armed Forces* (August 18, 1995) ("Miller memorandum"). Thorne argues that because the Miller memorandum, fairly read, precludes rebuttal of the presumption, cases decided under the Plan prior to its issuance are entitled to scant, if any weight, and that the Miller memorandum establishes the irrebuttability of the presumption.

As it happens, the eighth case, decided after the issuance of the Miller memorandum, robs this argument of any force. There, an eighteen-year veteran surface warfare officer was retained by the Navy notwithstanding his declaration of homosexuality. The facts are instructive. In mid-April, 1995, the officer approached his Commanding Officer (CO) in a distraught state and requested an opportunity to speak with him in private. At the time of this confidential conversation, the officer's male companion was in the last stages of AIDS. A heartfelt desire to attend to the final needs of his dying, male companion moved the officer to request the CO to grant him leave. In support of this request, the officer explained the circumstances, in the course of which the officer disclosed his homosexuality. The CO pointedly asked him whether he was also HIV positive, but the officer emphatically responded that he was not. As required by the Plan, the CO reported the officer's disclosure of homosexuality.

Thereafter, on October 6, 1995, the Navy convened a Board of Inquiry to investigate the officer's statement and to determine his future in the military. In an unsworn statement to the Board, the officer attempted to

---

9. In Case No. 3, a nuclear field mechanic, who approached his ship's drug and alcohol counselor about his alcohol problems, volunteered that he was gay after being encouraged to be frank about the source of his underlying tension. After the ship returned to port, the counselor disclosed that privileged communication to the mechanic's Executive Officer (XO). The XO then confronted the service member about his status, which he subsequently confirmed. Notwithstanding his two statements of homosexuality, which he did not disavow, the Board of Inquiry unanimously voted to retain him, finding that the military's evidence did not sufficiently demonstrate that he engaged in, intended to engage in, or had a propensity to engage in illicit homosexual acts.

10. In other words, Cases Nos. 2 and 5 involved rebuttal by recantation. The service member in Case No. 2 claimed to be "confused about [his] sexual preference" and declared that he was "not engaged in any type of sexual activity ... with anyone." Likewise, in Case No. 5, an admitted bisexual but married Naval combat systems officer recanted his interest in men: "I want to raise children. I want to be a parent.

I'm not going to get that if I go with a guy.... I believe in monogamy. I believe in a stable family life. Those are things that aren't going to change, even if I did lose my wife."

11. According to the Miller memorandum:

A member may not avoid the burden of rebutting the presumption merely by asserting that his or her statement of homosexuality was intended to convey only a message about sexual orientation, as defined in the Directives, and not to convey any message about propensity or intent to engage in homosexual acts. To the contrary, by virtue of the statement, the member bears the burden of proof that he or she does not engage in, and does not attempt, have a propensity, or intend to engage in homosexual acts. If the member in rebuttal offers evidence that he or she does not engage in homosexual acts or have a propensity or intent to do so, the offering of the evidence does not shift the burden of proof to the government. Rather, the burden of proof remains on the member throughout the proceeding.

Memorandum at 2 (citations omitted).

rebut the presumption by stating that: "Because I am a naval officer, you may presume that I engage in … and intend to engage in the duties and responsibilities that I have been charged with since taking my oath as a naval officer." He also pledged that: "As I stand before you, I do not intend to engage in any activities which are contrary to Navy or Department of Defense regulations." By unanimous vote, the Board of Inquiry found that he had uttered a statement of homosexual orientation and had failed to rebut the presumption the statement created.

Subsequently, however, a Board of Review overturned the Board of Inquiry's decision and retained the openly gay officer. In its memorandum to the Secretary of the Navy, the Board of Review explained that the Board of Inquiry had erred in finding that the officer had not rebutted the presumption. Among the Board of Review's reasons for so ruling was that the officer had rebutted the presumption by pledging to refrain from homosexual conduct.[12]

Thorne seeks to diminish the significance of this eighth case by calling it an "aberration." Specifically, he discounts its significance simply because the Board of Review contravened the Miller memorandum. In short, Thorne seeks to invalidate the Plan on its face even though the Navy retained an openly gay officer. In this respect, Thorne borrows a page from the district court's play book in *Able*. There, the district court discounted three cases in which the presumption was rebutted (all of which predated the

Miller memorandum) by characterizing them as "aberrations that cannot be taken to show that the Act holds out any realistic opportunity to rebut the presumption." *Able*, 880 F.Supp. at 976.

█ Thorne's approach fails for the same reason the Second Circuit expressly rejected this "aberration" theory. *See Able v. United States*, 88 F.3d 1280, 1297–98 (2d Cir.1996). Essentially, that theory contradicts the stringent standard of review for facial constitutional challenges, which is simply that "the challenger must establish that no set of circumstances exists under which the Act would be valid." *Jordan v. Jackson*, 15 F.3d 333, 343–44 (4th Cir.1994) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987)).[13] Even discounting altogether seven of the eight cases in which the presumption was rebutted, Thorne's facial challenge cannot succeed in light of the stringent standard of review promulgated by the Fourth Circuit in *Jordan*. In other words, the fact that at least one service member rebutted the presumption without disavowing his statement of homosexuality in this post-Miller memorandum era fatally undercuts Thorne's facial constitutional challenge.

█ As for Thorne's as-applied challenge, that attack fails as well because Thorne made no attempt to rebut the presumption in the administrative proceeding. In fact, Thorne's counsel admitted at the separation hearing that "[w]e have not and will not rebut the presumption," contending instead that the

12. As further support for this finding, the Board cited a DoD-funded study showing that homosexual service members, in many instances, successfully refrain from engaging in prohibited acts as well as the officer's negative tests for HIV. Other grounds relied on by the Board included: (i) the government's failure to present persuasive evidence of the officer's homosexual conduct; (ii) the officer's past performance and credibility over the span of his career; (iii) the stressful circumstances under which the officer made the statement and his intent in doing so; and (iv) the fact that the introduction of the Miller memorandum tainted the result of the Board of Inquiry's proceeding.

13. Recently, some Justices of the Supreme Court have begun to question the continuing validity of the *Salerno* rule. This debate recently erupted in

*Janklow v. Planned Parenthood, Sioux Falls Clinic*, —— U.S. ——, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996). *Compare id.* at ——, 116 S.Ct. at 1582 (Stevens, J., concurring in the denial of certiorari) (asserting that a statute may be facially vulnerable if unconstitutional in a "large fraction" of cases), with *id.* at ——, 116 S.Ct. at 1584 (Scalia, J., dissenting from the denial of certiorari) (arguing that a statute may be facially vulnerable only if unconstitutional in every set of circumstances). For cases discussing this conflict and the resulting uncertainty, see *Able*, 88 F.3d at 1297–98; *Ingebretsen v. Jackson Public School Dist.*, 88 F.3d 274, 285 (5th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 388, 136 L.Ed.2d 304 (1996); *Florida League of Professional Lobbyists v. Meggs*, 87 F.3d 457 (11th Cir.1996). In any event, the Fourth Circuit has expressly adopted *Salerno*'s "no circumstances" standard.

government failed to meet its threshold burden of proving a statement that demonstrates a propensity or intent to engage in homosexual conduct. Unfortunately for Thorne, the Fourth Circuit in *Thomasson* disagreed with that same argument, holding that the declaration of one's homosexuality alone and unrebutted provides sufficient evidence of a propensity to engage in prohibited acts. *Thomasson*, 80 F.3d at 930. Thus, *Thomasson* held that the DoD's use of a service member's declaration of homosexuality to give rise to a rebuttable presumption of prohibited conduct is not a First Amendment violation.

For the foregoing reasons, Thorne's First Amendment attack on the Plan fails. Accordingly, Thorne's motion for summary judgment must be denied, while the government's similar motion must be granted.[14]

14. This Memorandum Opinion focuses very narrowly on a specific First Amendment challenge to the Plan. Thus, nothing in the opinion or the result reached should be construed as reflecting the Court's views, irrelevant here, on the Plan's morality or its wisdom as public policy.